UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:15-CV-00190-FDW

| | | |
|---|---|---|
| LJW LAND, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| OLD REPUBLIC NATIONAL TITLE | ) | |
| INSURANCE COMPANY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment. (Doc. No. 11). Plaintiff filed an Opposition. (Doc. No. 14). Defendant filed a Reply. (Doc. No. 15). The Court heard oral argument from the Parties on the motion.

## BACKGROUND

Plaintiff, LJW Land, LLC, ("LJW" or "Plaintiff") the insured mortgagee, brought an action against its title insurer, Defendant, Old Republic National Title Insurance Company, ("ORT") alleging breach of a duty to defend against a claim brought by the second mortgage holder, Ardley Land, LLC, ("Ardley") to Quiet Title and declare the Insured's First Mortgage extinguished. Defendant moved for Summary Judgment. Plaintiff opposes and asserts that there exists a genuine issue of material fact as to whether the Title Insurance Policy exclusion for adverse claims were created, suffered, assumed or agreed by the Insured Claimant.

This lawsuit arises from a title insurance policy coverage dispute – specifically whether ORT had a duty to defend Plaintiff against a count, titled "Quiet Title", asserted against LJW by Ardley in Mecklenburg County Civil Action Number 14-CVS-3654 (the "Ardley Lawsuit").

1

The claims asserted in the Ardley Lawsuit were premised on allegations that LJW conspired to eliminate Ardley's interests in certain real property, committed unfair and deceptive trade practices, and allowed itself to be dominated by its principal to the point that LJW no longer existed as a separate corporate entity. As a remedy for LJW's actions, Ardley sought (among other relief) to have the Mecklenburg County Superior Court declare that a certain deed of trust for the benefit of LJW (and for which ORT had issued a policy of title insurance) be extinguished, canceled of record or made subordinate to the interests of Ardley in the subject property.

LJW requested that ORT provide it with a defense to the Quiet Title count and this request was denied on the grounds that the claims in the Ardley lawsuit were excluded from coverage pursuant to the terms of the title insurance policy.

The issue before this Court is whether this denial was proper. The answer is found in an application of North Carolina's rules of construction for insurance policies which provides that an insurer's duty to defend is determined through a side by side comparison of the complaint at issue to the relevant policy. Significantly, for purposes of this comparison, the allegations in the complaint at issue are taken as true. *See* <u>Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC</u>, 364 N.C. 1, 692 S.E.2d 605 (2010).

Applying the controlling law and required rules of construction to the comparison of the title insurance policy at issue in this case to the [amended] complaint in the Ardley Lawsuit, the claims against LJW in the Ardley Lawsuit are within the provisions of the title insurance policy's Exclusion 3(a), are not covered matters, and there was not a duty to defend same. As such, ORT is entitled to summary judgment in its favor as a matter of law.

## I.  FACTUAL BACKGROUND

### The LJW Deed of Trust and The Policy

On August 29, 2012, a deed of trust for the benefit of LJW was recorded in Book 27612, Page 695 of the Mecklenburg County Register of Deed (the "LJW Deed of Trust").  The LJW Deed of Trust secured a loan to an entity related to LJW, Reverdy Development, LLC, for the purchase (and development) of certain property from Ardley.  In connection with the granting of this deed of trust to LJW, ORT issued a lender's title insurance policy number LX-09706119 (the "Policy") to LJW. (Doc. 1, Compl. ¶ 3-4 and Ex. A; Doc 3. ¶3  and Ex. A)

### The Waters Related Parties

LJW was created in 2007, its stated purpose being to "engage in the purchase and selling of real estate . . ."  The manager of LJW is William W. Waters ("Bill Waters"). The sole member of LJW is Waters Construction Company, Inc. ("Waters Construction"). (Doc. 12, Ex. 5: Interrog. No. 8 and Ex. 5(a))

Waters Construction, in turn, was created in 1965 by Bill Waters, who served as the chair of its board of directors, president, majority shareholder and eventually sole shareholder. In 2006, all shares of Waters Construction were transferred to William W. Waters, II ("Wes Waters"), son of Bill Waters.  Wes Waters became the sole shareholder, director and president of Waters Construction**.** (Doc. 12, Ex.5: Interrog. No. 9  and  Ex. 5(c): Waters Construction Corp. Docs.)

Reverdy Development, LLC ("Reverdy") was created in February 2010 for the purpose of engaging in "the business of real estate development and sales . . ."  The sole member of Reverdy was and is Waters Construction. Wes Waters has been the manager of Reverdy since its creation. (Doc. 12, Ex. 5: Interrog. No. 7 and Ex. 5(b): Reverdy corporate docs)

### The Ardley Lawsuit

On March 3, 2014 Ardley filed the Ardley Lawsuit in Mecklenburg County, North Carolina Superior Court against Reverdy, LJW, Bill Waters and Wes Waters (the "Waters Defendants") ("the Ardley Lawsuit"). Ardley asserted various claims against the Waters Defendants arising out of alleged wrongful actions on the part of same, in connection with a real estate deal involving a residential subdivision in Mint Hill, North Carolina. The claims asserted against LJW in the Ardley Lawsuit included: "Control/Mere Instrumentality/Alter Ego"; "Conspiracy", "Unfair and Deceptive Trade Practices". (Doc. 3, Ex. B - Ardley Compl.; Doc 5, ¶ 4)

On July 1, 2014, Ardley filed a Motion to Amend the above-referenced Complaint, and on September 19, 2014, Ardley filed its Amended Complaint which included the same claims against LJW identified above, added Waters Construction as a defendant, and added an additional claim titled "Quiet Title" in which Ardley sought to have the LJW Deed of Trust declared to be extinguished and canceled of record as a remedy for the alleged actions of LJW (the "Ardley Amended Complaint"). (Hereafter, references to the "Waters Defendants" includes Waters Construction. (Doc. 3, Ex. C: Ardley Amend. Compl.; Doc. 12, Ex 4: certified copy Ardley Amend. Compl.)

The allegations which are pertinent to the subject matter of this action are as follows:

> 92.     The allegations of paragraphs 1-91 are re-pleaded and incorporated herein by reference.
>
> 93.     The LJW Land Deed of Trust represents an interest of record in the Property which, as the purported first lien on the Property, is adverse to Ardley's interest in the Property under the Ardley Deed of Trust.
>
> 94.     At all times referred to herein, Reverdy (in whose name title to the Property is held), LJW Land (in whose name the LJW Deed of Trust is held) and Waters Construction (in whose name

the membership interest in Reverdy and LJW are held) were created, controlled, dominated, operated and used as the mere instrumentalities or alter egos of Bill Waters and/or Wes Waters, and by reason thereof these corporate and company entities should be disregarded and the corporation and companies, on the one hand, and the shareholders and investors (namely Bill Waters and Wes Waters) on the other hand, should be treated as one and the same.

95. Because Reverdy, LJW Land and Waters Construction are mere instrumentalities and alter egos of Bill Waters and/or Wes Waters, the transfer of title under the Deed and the transfer of a purported first lien under the LJW Deed of Trust had the same effect as if both of those interests had been transferred to the same person(s), namely Bill Waters and/or Wes Waters; and by reason thereof the Property interests purportedly created under the LJW Deed of Trust were extinguished when they merged into fee simple title held by Bill Waters and/or Wes Waters.

96. Pursuant to N.C.G.S. §41-10, Ardley is entitled to and hereby seeks an order quieting title to the Property and declaring that the LJW Deed of Trust has been extinguished, that it be canceled of record, and that the Ardley Deed of Trust constitutes a first lien on the Property.

(the "Quiet Title Claim") (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶92-96)

**The Title Insurance Claim**

On July 16, 2014, LJW, through counsel, requested that ORT defend it against the Quiet Title claim it anticipated would be asserted in the Ardley Amended Complaint. On July 28, 2014, ORT responded to LJW, setting forth its determination that, pursuant to Exclusion 3(a) of the Policy, ORT did not have an obligation to provide a defense or indemnification for the claims asserted in the Ardley Lawsuit.   ORT declined to defend the Quiet Title action and declined coverage on the basis of the Section 3(a) Exclusion in the policy which excludes "any defect, lien, encumbrances or adverse claim created, suffered, assumed or agreed to by the insured claimant". Following the filing of the Ardley Amended Complaint, LJW requested that ORT reconsider

its request for a defense; ORT's position on the applicability of Exclusion 3(a) remained unchanged. (Doc. 12, Ex. 2(d), 2(e), 2(f) and 2(g))

<u>**Settlement of the Ardley Lawsuit**</u>

Ultimately, the Waters Defendants, including LJW, entered into a settlement agreement with Ardley which resolved all claims in the Ardley Lawsuit and, in addition, settled another dispute, unrelated to the Property. As part of the settlement, LJW was assigned the $250,000 Reverdy Note, Reverdy Deed of Trust and the Option Contract. LJW contends it paid $250,000 for these assignments. (Doc. 1: Compl**.** ¶11; Doc. 12, Ex. 5: Interrog. No. 12) Further, all of the Waters Defendants were released from the claims asserted by Ardley and all claims against them were dismissed with prejudice. (Doc. 12, Ex. 5(d))

## II.  PROCEDURAL HISTORY

On April 2, 2015, Plaintiff commenced this lawsuit, originally in Mecklenburg County Superior Court, asserting a claim for breach of contract. Specifically, LJW asserted that ORT "breached its policy of insurance with the Plaintiff by failure to defend the Quiet Title Claim for Relief and by failing to pay any portion of the settlement amount paid by Plaintiff to Ardley Land." (Doc. 1, Compl. ¶12) ORT removed the action to this Court on April 30, 2015 and filed its Answer and Counterclaim for Declaratory Judgment on May 6, 2015. The Plaintiff filed a Reply to the Counterclaim on May 26, 2015. (Docs. 3 and 5)

## III.  <u>DEFENDANT ORT'S MOTION FOR SUMMARY JUDGMENT</u>

ORT seeks summary judgment in its favor as to the Complaint and as to its counterclaim on the basis that, under the Policy, it had no duty to defend or indemnify LJW in connection with the Ardley Lawsuit.

## A.    Jurisdiction and Applicable Law

This Court has subject matter jurisdiction pursuant to 28 USC §1332(a)(1). In a diversity case, a district court will apply the conflict of laws rules of the forum state. <u>Klaxon v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496-97 (1941).   Under North Carolina law, any policy insuring interests in North Carolina is deemed to have been made  in and subject to North Carolina law.  N.C.G.S. § 58-3-1; *see also* <u>Fortune Ins. Co. v. Owens</u>, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000). Therefore, North Carolina insurance law and contract interpretation principals apply to the present matter.

## B.    Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>Bouchat v. Balt. Ravens Football Club, Inc.</u>, 346 F.3d 514, 519 (4th Cir. 2003); *see also* <u>Ellis v. Muller</u>, N.C. App. 367, 238 S.E.2d 187 (1977).   The court determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986).  The moving party has the burden to show the court it must prevail because there are no genuine issues of material fact, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986), and the non-moving party must then demonstrate the existence of "evidence from which a jury might return a verdict in his favor." <u>Anderson</u>, 477 U.S. at 257.  In making its decision, the Court must view the facts and all inferences drawn from the facts in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986); *see also* <u>Henson v. Jefferson</u>, N.C. App. 204, 200 S.E.2d 812 (1973).

Summary Judgment is appropriate in this case because the question of whether ORT had a duty to defend is a question of law determined by interpretation and application of the language

of the Policy. <u>Erie Ins. Exch. v. St. Stephen's Episcopal Church</u>, 153 N.C. App. 709, 570 S.E. 2d 763, 765 (2002).

## C.    Interpreting Insurance Contracts

The interpretation of an insurance policy provision is a question of law and the rules for interpreting the meaning "have long been established". *See* <u>Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.</u>, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970); *see also* <u>North Carolina Farm Bureau Mut. Ins. Co. v. Mizell</u>, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000).   "As with all contracts, the object of construing an insurance policy 'is to arrive at the insurance coverage intended by the parties when the policy was issued.'" <u>Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC</u>, 364 N.C. 1, 9, 692 S.E. 2d 605, 612 (N.C. 2010).

In interpreting the terms of an insurance contract **"**[i]f the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein".   <u>Dawes v. Nash County</u>, 357 N.C. 442, 449, 584 S.E.2d 760, 764 (2003). *See also* <u>*Rouse v. William Realty Bldg. Co. Inc.*</u>, 143 N.C. App. 67, 69-70, 544 S.E. 2d 609, 612 (2001):  If the policy language is clear courts must interpret it accordingly "without re-writing the contract or disregarding the express language used…The  duty is a solemn one, for it seeks to preserve the fundamental right of freedom of contract."

Consistent with this guiding principal, defined terms in a policy must be given their defined meaning, while undefined and nontechnical terms "are to be given a meaning consistent with the sense in which they are used in ordinary speech, unless the context clearly requires otherwise." <u>Westchester Fire Ins. Co.</u>, 172 S.E.2d 518*,* 522 (N.C. 1970).  "Each word is deemed

to have been put into a policy for a purpose" and is to be given effect, if possible, by any reasonable construction.  Id.

"An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." Schenkel & Shultz, Inc. v Hermon F. Fox & Associates, P.C., 362 N.C. 269, 273, 658 S.E.2d 918, 921 (N.C. 2008). North Carolina courts construe ambiguities in favor of the insured.  Id.

However, the preceding rule of construction is only applied when a provision in an insurance policy is ambiguous. "To be ambiguous, the language of an insurance policy provision must, 'in the opinion of the court, [be] fairly and reasonably susceptible to either of the constructions for which the parties contend.'…If the language is not 'fairly and reasonably susceptible' to multiple constructions, then [the court] 'must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policy holder did not pay.'" Harleysville, 692 S.E.2d at 612 (citations omitted).

In reviewing insurance policies, the North Carolina courts find that "the burden is on the insured to show coverage.  If the insurer relies on a clause of the policy which excludes coverage, the burden is on the insurer to establish the exclusion." Nationwide Mut. Ins. Co. v. McAbee, 268 N.C. 326, 328, 150 S.E.2d 496, 497-98 (1966).

**D.      Duty to Defend**

North Carolina uses the "comparison test" to determine whether an insurer has a duty to defend its insured against claims asserted against the insured. Under this test, the policy and complaint at issue are read side-by-side to determine whether the events as alleged are covered or excluded.  "In determining whether an insurer has a duty to defend, the facts as alleged in the complaint are to be taken as **true** and compared to the language of the policy.

If the insurance policy provides coverage for the facts as alleged, then the insurer has a duty to defend." <u>Harleysville</u>, 692 S.E.2d at 611. As the North Carolina Supreme Court further explained:

> In addressing the duty to defend, the question is not whether some interpretation of the facts as alleged could possibly bring the injury within the coverage provided by the policy; the question is, assuming the facts as alleged to be **true**, whether the insurance policy covers the injury.

<u>Id.</u> at 7.

These rules of construction apply equally to the application of exclusions in an insurance policy. In <u>Harleysville</u>, the North Carolina Supreme Court remanded to the trial court for entry of summary judgment in favor of the insurers on the issue of the duty to defend where a comparison of the policy to the complaint against the insured (and for which the insured had sought a defense from the insurer) established that the claims against the insured for making false statements about its own product where excluded from coverage.

## IV.   <u>ANALYSIS</u>

The issue before the Court is whether, under the Policy, ORT was required to defend LJW against Ardley's claims (in particular, the claim titled "Quiet Title"). ORT disclaims any duty to defend LJW arguing that Exclusion 3(a) of the Policy excludes coverage. LJW argues that Exclusion 3(a) does not exclude the "Quiet Title" claim from coverage.

Pursuant to the law and principals set forth above, in order to make this determination, this Court must compare the language of the allegations in the Ardley Amended Complaint, which are to be regarded as true, and the Policy.

### A.    **Allegations in the Ardley Amended Complaint**.

The Ardley Amended Complaint alleged that in 2007 Ardley acquired a 28 plus acre

parcel of land in Mint Hill (the "Property") which it began to develop as a residential subdivision. In the spring of 2012, Bill Waters entered into discussions with Rick Judson, manager of Ardley, regarding Bill Waters' purchase of the Property and completion of the development, with Ardley retaining an option to purchase subdivision lots at certain prices. During this time period, the Home Builders Association of Charlotte ("HBAC") agreed to hold its annual "Homearama" event at the development, which would result in immediate lot sales and improved visibility and desirability for the Property. In August of 2012 Bill Waters agreed to purchase the Property from Ardley. (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶¶ 8-16).

"Bill Waters asserted complete control over the 'purchaser' side of the transaction and directed the preparation of documents where the Property would be titled in the name of Reverdy, an LLC of which his son [Wes Waters] was manager and a company that Bill Waters represented to Judson was 'his development arm'. To finance the transaction, Bill Waters decided that another company that he owned and controlled, LJW Land (his 'lending arm') would lend $1,150,000 to Reverdy to pay off [a deed of trust on the Property]. Bill Waters decided that Reverdy would then issue a Deed of Trust in favor of LJW Land to cover both the $1,150,000 payoff and an additional $800,000 anticipated to be lent by LJW Land to Reverdy to complete the Development. Reverdy would then issue a Promissory Note and subordinated Deed of Trust in favor of Ardley in the amount of $250,000 representing the balance of the purchase price payable by Reverdy to Ardley for the Property, which amount was seller financed by Ardley to Reverdy." (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶¶ 17-19).

Judson asked Bill Waters why LJW needed to build in an $800,000 cushion when the maximum cost to complete development was $400,000 - $500,000, to which Bill Waters

responded that he was going to "make a little something for myself." (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶ 20)

As further consideration for Reverdy's purchase of the Property and Ardley's subordination of its seller-financed deed of trust, Bill Waters agreed to personally and unconditionally guaranty Reverdy's performance of all development activities necessary to complete the development. (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. 21)

The closing of the purchase of the Property occurred on or about August 23, 2012; as a result of which, the following documents were executed by the Waters entities and Ardley:

> (1) Deed from Ardley conveying the Property to Reverdy subject to an Option to Purchase in favor of Ardley (the "Deed");
> (2) Deed of Trust from Reverdy for the benefit of LJW Land (previously defined as the LJW Deed of Trust);
> (3) Purchase money deed of trust from Reverdy for the benefit of Ardley;
> (4) Option Purchase Pricing Contract (the "Option Contract") between Reverdy and Ardley which required Reverdy to develop 46 lots and provided a pricing structure pursuant to which Ardley was entitled to take title to the lots. "The purpose of the Option Contract was to allow Ardley an opportunity to repurchase the developed lots to build residential dwellings on said lots, and to sell the improved lots at a profit to the general public."
> (5) Guaranty of Development Performance ("Development Guaranty"), pursuant to which Bill Waters "unconditionally personally guaranteed Reverdy's performance of 'all development activities necessary to develop all 46 lots of the property . . .'" and agreed that there would be substantial completion of the development by February 13, 2013;
> (6) Cashier's check made payable to Reverdy in the amount of $1,150,000 was endorsed by Bill Waters to counsel for Ardley's trust account, "indicating that he had actual and apparent authority to act on behalf of Reverdy."

(Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶ 22).

Bill Waters and Reverdy failed to proceed with development at the pace required by the terms of the Option Contract and Development Guaranty which led to the loss of

"Homearama" and the guaranteed sales and market exposure from the event. Further, required road improvements failed the Town of Mint Hill's inspections resulting in an April 17, 2013 Notice of Violation and Stop Work Order. Despite demand from the Town of Mint Hill, Reverdy failed and refused to comply with the Town's demand to proceed with development of the Property in accordance with approved plans. (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶ 23- 28).

In January of 2014, LJW, without resistance from Reverdy and, in fact, with Reverdy's cooperation, commenced foreclosure under the LJW Deed of Trust. In connection with LJW's foreclosure, Bill Waters executed an affidavit on behalf of LJW, as its manager. During this same time period, Bill Waters testified at a Mint Hill Town meeting on behalf of and as a representative of Reverdy. (Doc. 3, Ex. C; Doc. 12, Ex. 4: Ardley Amend. Compl. ¶ 29-33).

## Claims for Relief asserted against LJW in the Ardley Lawsuit

In its first claim for relief, based on the assertion that the LJW foreclosure was simply a mechanism to eliminate the Ardley Deed of Trust and Ardley's option to purchase and to avoid Bill Water's obligations under the Development Guaranty, Ardley sought injunctive relief to prohibit the foreclosure of the LJW Deed of Trust. (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶ 37-47).[1]

Per Ardley's fifth claim for relief ("Control/Mere Instrumentality/Alter Ego"), at all times relevant to the Ardley Lawsuit and "specifically with respect to the transactions surrounding the purchase of [the Property], the completion (and failure to complete the development of the [Property]) and the initiation of the foreclosure procedure to wipe out Ardley's interests in the Property, Bill Waters and/or Wes Waters have exercised complete

---

[1]   Ardley's second, third, fourth and sixth claims for relief are not asserted against LJW.

domination and control over the finances, policies, business practices and other affairs of Reverdy, LJW Land and Waters Construction. Bill Waters and/or Wes Waters have used their control and domination of these entities to commit fraud or wrong, to violate certain legal duties, and/or to commit dishonest or unjust acts in contravention of Ardley's rights." (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶ 71-74)

Ardley's sixth claim for relief, "Conspiracy", asserts that "Reverdy, Bill Waters, LJW Land, Wes Waters and Waters Construction have entered into an agreement to cause the Property to be foreclosed upon so as to eliminate Ardley's interest in the Property, despite their antecedent breach of contracts with Ardley. In reaching this agreement, Reverdy, Bill Waters, LJW Land, Wes Waters, and Waters Construction have engaged in a civil conspiracy by agreeing and colluding to do an unlawful thing or to do a lawful thing in an unlawful way." (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶75-78) Ardley's seventh claim for relief is for unfair and deceptive trade practices. Its eighth claim for relief seeks an accounting for all monies advanced by LJW to Reverdy in connection with the development. (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶ 86-91)

### The "Quiet Title" Claim

The final claim directed at LJW is Ardley's ninth claim for relief, titled "Quiet Title". This Count appears at paragraphs 92 through 96 of the Ardley Amended Complaint and is set forth in full above. (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amend. Compl. ¶ 92-96).

**B.     Provisions of the Policy**

The relevant insuring provisions are as follows:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, A Minnesota corporation (the "Company") insures as of Date of Policy . . .

against loss or damage, not exceeding the Amount of Insurance,
sustained or incurred by the Insured by reason of:

* * *

9.  The invalidity or unenforceability of the lien of the Insured
Mortgage upon the Title. . . .

10.  The lack of priority of the lien of the Insured Mortgage upon
the Title over any other lien or encumbrance.

(Doc.1, Compl.  Ex. A; Doc. 3, Ex. A)

Thus, absent an applicable exclusion or exception, the Policy would provide coverage

for claims asserted against LJW in the Ardley Amended Complaint which challenged the

validity and/or priority of the LJW Deed of Trust.  However, ORT argues that the claims

contained in the Ardley Amended Complaint are excluded from coverage by Exclusion 3(a)

of the Policy.

Exclusion 3(a) provides:

The following matters are expressly excluded from the coverage
of this policy, and the Company will not pay loss or damage,
costs, attorneys' fees, or expenses that arise by reason of:

3.  Defects, liens, encumbrances, adverse claims or other matters:

(a)  created, suffered, assumed or agreed to by the
Insured Claimant;

("Exclusion 3(a)") (Doc. 1, Compl., Ex A; Doc. 3, Ex. A).

For the reasons set forth below, this Court agrees with ORT's assertion that Exclusion

3(a) applies and that ORT, thus, had no duty to defend.

C.      **Application of Controlling Law**

While the Court is not aware of any controlling North Carolina authority specifically

addressing the application of Exclusion 3(a)[2], North Carolina law (as set forth above) provides

---

[2] LJW references National Mortgage Corp. v. American Title Ins. Co., 41 N.C. App 613, 255 S.E.2d

clear rules for interpreting insurance policies and more specifically, for making a determination as to an insurer's duty to defend. Applying these rules to the case at hand, by its plain terms, the Policy excludes from coverage, any loss resulting from any adverse claim or defect "created" or "suffered" by LJW (the insured claimant). The words "created" and "suffered" are not defined or technical terms and thus must be given a meaning "consistent with the sense in which they are used in ordinary speech, unless the context clearly requires otherwise". Westchester Fire Ins. Co., 172 S.E.2d at 522. "Create" is defined by the Merriam-Webster dictionary as: "to bring into being, to cause to exist, to produce". Black's Law Dictionary (Second Edition) defines "suffer" as to "suffer an act to be done by a person who can prevent it, is to permit or consent to it; to approve it and not hinder it . . ." The language of Exclusion 3(a) is unambiguous and must be given its plain and ordinary meaning.

Taking the allegations of the Ardley Amended Complaint as true, LJW participated in a conspiracy, unfair and deceptive trade practices and a disregard for corporate formalities to the point that LJW ceased to exist as an entity separate and apart from Bill and Wes Waters. Based on this, Ardley sought relief in the form of an order declaring that the LJW Deed of Trust had been extinguished, canceled of record and that the Ardley Deed of Trust constituted a first lien on the Property.

When the Ardley Amended Complaint and the Policy are read side-by-side, the

---

622 (1979). It appears that the case was reversed in its entirety by the North Carolina Supreme Court (299 N.C. 369, 261 S.E.2d 844 (1980)) and has no precedential value (holding "[n]othing else appearing, title insurance operates to protect a purchaser or mortgagee against defects in or encumbrances on title which are in existence at the time the insured takes his title. … 'It is not prospective in its operation and has no relation to liens or requirements arising thereafter.'"…. [citations omitted] National Mortgage, 261 S.E.2d 844, 847. The court concluded that the acts giving rise to the defect occurred after the date of the policy and thus the loss related to same was not a covered matter. While the North Carolina Supreme Court did not reach the question of whether the policy exclusion for defects created by the insured applied, the court specifically noted that the loss suffered by plaintiff may be excluded from coverage by the "created, suffered" exclusion. Id. at 848.

complaint alleges that LJW's actions (intentional torts such as conspiracy, unfair and deceptive trade practices, disregard for corporate formalities to the point that LJW was a mere instrumentality of the Waters) caused ("created") the extinguishment of the LJW Deed of Trust. Read more passively, the Ardley Amended Complaint alleges that LJW's inaction, in failing to follow corporate formalities, allowing domination and control by Bill and Wes Waters to the point that it was a mere instrumentality of the Waters, permitted ("suffered") the merger of the Waters Defendants' interest in the Property causing, in turn, Ardley asserted, the extinguishment of the LJW Deed of Trust.

In short, per the Ardley Amended Complaint, the "invalidity or unenforceability" of the LJW Deed of Trust and/or its "lack of priority" over the Ardley Deed of Trust was created (caused) or suffered (permitted) by LJW's own actions or inactions which falls squarely within Exclusion 3(a).

## Consideration of the Quiet Title Claim in Isolation

LJW argues that the "Quiet Title" claim must be considered separately from the preceding allegations in the Ardley Amended Complaint. (Doc. 14, pp.1-2). This argument ignores the first allegation of the Quiet Title claim which states: "[t]he allegations of paragraphs 1-91 are repleaded and incorporated herein by reference". (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amended Compl., ¶ 92). Thus, the Quiet Title claim rests on the allegations that LJW conspired to eliminate Ardley's interests in the subject property, committed unfair and deceptive trade practices, as wells as the allegations in paragraphs 93-96 that LJW disregarded corporate formalities to the point it was not a separate entity but instead a mere instrumentality/alter ego of Bill and/or Wes Waters. *See* Greenwich Insurance Company v. Medical Mutual Insurance Company of North Carolina, 88 F. Supp. 3d 512 (E.D.N.C. 2015) finding no duty to defend a particular claim where all the claims in the complaint at issue and

all potential loss resulted from and were inextricably intertwined with allegations of lack of good faith.

Even if the Ardley Amended Complaint consisted of only paragraphs 93-96, Exclusion 3(a) would still preclude coverage. Contrary to LJW's argument, the allegations under the Quiet Title claim heading are not simply benign descriptions of the Waters Defendants' corporate structure. (Doc. 14, p. 8 and 13). Instead, Ardley alleges that LJW, in failing to follow corporate formalities and allowing domination and control by the Waters to the point it was a mere instrumentality of the Waters, caused a merger of the Waters Defendants' interests in the Property, causing, in turn, the extinguishment of the LJW Deed of Trust. (Doc. 3, Ex. C and Doc. 12, Ex. 4: Ardley Amended Compl. ¶ 94-96). Thus, the "invalidity or unenforceability" of the LJW Deed of Trust was created (caused) or suffered (permitted) by LJW's own alleged inequitable behavior and any loss caused by this defect is excluded from coverage.

**D.      Guidance from other Courts**

Other Courts have analyzed this specific exclusion and while not controlling, demonstrate the consideration of similar exclusion language.

Of note is the Fourth Circuit opinion, <u>Murnan Spring Hill Trust v. Stewart Title Guaranty Company</u>, 374 Fed. Appx 459 (4th Cir. 2010). The Fourth Circuit, concluded that the word "suffer" was unambiguous and affirmed summary judgment in favor of the title insurer based on Exclusion 3(a). The Fourth Circuit explained:

> Although Murnan correctly notes that we construe ambiguities in an insurance policy against the insurer… the policy's exclusion of liens suffered by the insured is not susceptible to more than one construction. "Suffer" has only one meaning in this context. As the district court noted, the Sixth Circuit examined a provision excluding risks "created, suffered, assumed or agreed to" by the insured, which is identical to the language used in the policy here, and it explained that "the term 'suffered' has…been deemed synonymous with 'permit', which implies the power to prohibit or

> prevent the claim from arising…"…see also Black's Law
> Dictionary (8th ed. 2004) (defining "suffer" to include "to allow or
> permit (an act, etc.))

Murnan, 374 Fed. Appx at 461 (citations omitted)

The Eighth Circuit, in Brown v. St. Paul Title Ins., 634 F. 2d 1103 (8th Cir. 1980) helpfully summarized cases from a number of jurisdictions (and these cases in turn, included a number of cases cited by LJW) noting that cases discussing the applicability of the "created or suffered" exclusion have generally concluded there is no liability for the title insurance company where it is established "…that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved. The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss." Brown, 634 F.2d 1103, 1110 [citations omitted].

The Brown case involved a construction loan and the failure of the insured lender to advance funds to subcontractors. In contrast to the case at hand, the Brown case did not include allegations of inequitable and/or intentionally tortious conduct by the insured lender. Nonetheless, and having summarized cases as set forth above, the Eighth Circuit concluded that the "created or suffered" exclusion applied, holding that the liens which arose were created or suffered by the insured lender and were expressly excluded from coverage under St. Paul's policy. Id at 1110.

In another case, the Ninth Circuit, examined language identical to the exclusion at issue in this case and determined that the title insurance company had no duty to defend pursuant to Exclusion 3(a) where the insured lender created -- meaning it participated in intentional but not necessarily illegal conduct -- an equitable mortgage adverse to its title as insured. Transamerica

<u>Title Ins. Co. v. Alaska Federal Savings & Loan Association</u>, 833 F.2d. 775 (9th Cir. 1987).

Also informative to this Court's decision is <u>First American Title Ins. Co. v Action Acquisitions, LLC</u>, 218 Ariz. 394, 187 P.3d 1107 (2008), an Arizona Supreme Court case which provided a general comparison of cases throughout the country which have analyzed the "created, suffered" exclusion and noted that courts have held, without requiring misconduct, that an insured creates a defect or risk simply by acting affirmatively to bring it about. *Id* at 1113. In the <u>First American</u> case, the insured bid $3500 at a foreclosure sale for property, then obtained a $400,000 title insurance policy. An action was brought to set aside the purchase on the grounds that the purchase price was grossly inadequate. First American refused to defend the insured on the grounds that this claim was excluded by the policy's "created, assumed or agreed to" exclusion. The Arizona Supreme Court analyzed the exclusion as follows:

> Considering the nature of title insurance, we conclude that the exclusion is not ambiguous and that it applies whenever the insured intended the act causing the defect, not only when the insured intended the defect or when the insured engaged in misconduct. Title insurance principally protects against unknown and unknowable risks caused by third-party conduct, not intentional acts of the policyholder. Otherwise, the insured would be able to use title insurance to make windfall profits.

<u>First American</u>, 187 P.3d 1107, 1113.3

In the case at hand, under either analysis (misconduct/inequitable behavior versus simply intentional conduct) and certainly under the Fourth Circuit's definition of "suffer", ORT had no duty to defend LJW from any of the claims asserted in the Ardley Amended Complaint. The allegations in the Ardley Amended Complaint go well beyond "innocent" behavior – alleging intentional torts and, even considering the Quiet Title claim independently, alleging, at a minimum, inequitable conduct by LJW in allowing/permitting itself to be so dominated by

the Waters that it ceased to exist as an independent corporate entity. For this behavior, Ardley asked the court to impose an equitable remedy – the extinguishment of the LJW Deed of Trust. Thus the defect in the LJW Deed of Trust was the product of LJW's own alleged behavior – whether affirmative action (the alleged intentional torts) or permissive inaction (disregarding corporate formalities/allowing its self to be dominated by the Waters). Having created or suffered the defect, Exclusion 3(a) is applicable and ORT had no duty to defend or indemnify LJW in connection with the Ardley Lawsuit.

Finally, <u>NPH Realty, Ltd. v. Ticor Title Ins. Co.</u>,1997 U.S. Dist. LEXIS 23648 (Mass. Dist. Ct. 1997) involved facts strikingly similar to the case at hand. NPH held a first mortgage on property owned by Daejan, Inc. ("Daejan"). Daejan, had also granted a second purchase money mortgage to Larken Realty Trust ("Larken"). Following default on the first and second mortgages, NPH was the high bidder at its foreclosure sale, which extinguished Larken's second purchase money mortgage. Larken filed suit against NPH (and Dajean) alleging that "NPH was an entity created and controlled by Daejan and that Daejan and NPH were colluding to squeeze out Larken's second mortgage." Larken sought a declaration that because of NPH's (and Daejan's) inequitable collusion, NPH's mortgage should be extinguished or declared subordinate to Larken's second mortgage. In connection with the Larken suit, NPH sought a defense from Ticor – Ticor denied coverage and did not provide a defense. NPH was successful at defending these claims at summary judgment, then settled with Larken to avoid the cost of appeal. <u>NPH Realty</u>, 1997 U.S. Dist. LEXIS 23648, 2.

NPH sued Ticor asserting that it had a duty to defend the Larkin lawsuit and to indemnify it for the $115,000 it paid to settle the suit. The court granted Ticor's motion for summary judgment, concluding it had no duty to defend, and thus no duty to indemnify. The court explained it's holding:

> Larken claimed in the state suit that NPH, as first mortgagee, owed a fiduciary duty to Larken, as second mortgagee, and that NPH violated that duty by acting in concert with Daejan to structure a transaction that was intended to extinguish Larken's second mortgage to the mutual benefit of NPH and Daejan. . . .
>
> . . . even if Larken's claims, on the surface, could properly be thought to allege a defect in title, those claims nonetheless fell within the policy's exclusion of defects "created, suffered, assumed or agreed to by the insured claimant." Larken's allegations were that NPH created the "defect" by its tortious deal with Daejan. That claim necessarily included the proposition that the defect was the product of NPH's own design, and so the case falls squarely within the exclusion.

Id., 1997 U.S. Dist. LEXIS 23648, 5-8.

This Court finds that reasoning persuasive.

Ultimately, taking the allegations in the Ardley Amended Complaint, and specifically, the Quiet Title claim, as true, but for LJW's own actions, or inactions, there would be no title defect (extinguishment of the LJW Deed of Trust, the remedy sought for LJW's behavior). This is the essence of why Exclusion 3(a) is included in the Policy - to make clear that the insurer is not assuming the risks for defects or loss caused by the insured's own conduct. To conclude that the provision is ambiguous or to construe this exclusion in a manner to afford coverage in this case would effectively re-write the contract to favor one sophisticated commercial entity over another.

As such, ORT had no duty to defend or indemnify LJW in connection with the Ardley Lawsuit, and ORT is entitled to summary judgment in its favor with respect to the claim asserted by LJW in this lawsuit and its counterclaim.

**CONCLUSION**

For the foregoing reasons, the court GRANTS ORT's Motion for Summary Judgment (Doc. No. 11), and declares that, pursuant to the terms of the Policy, there is no coverage for the claims in the Ardley Lawsuit, and ORT had no duty to defend or indemnify LJW with respect to same.

SO ORDERED.

Signed: August 12, 2016

Frank D. Whitney
Chief United States District Judge